615 A.2d 1379

**Virginia BROWN, Administratrix of the Estate of Lawrence Brown and individually, Joan Brown Spina, John Brown and Thomas R. Brown, Appellants,**

v.

**DELAWARE VALLEY TRANSPLANT PROGRAM, Arthur Harrell, Howard Nathan, Brandywine Hospital, Norman Ledwin, James P. Argires, M.D., Phillippe Oullette, Charles R. Wagner, M.D., and Samuel Heed, Esquire.**

Superior Court of Pennsylvania.

Argued May 1, 1992.

Filed Nov. 13, 1992.

William R. Hagner, Paoli & Joseph F. Lawless, Jr., Philadelphia, for appellants.

George E. Rahn, Jr., Philadelphia, for Brandywine Hosp. and Norman Ledwin, appellees.

Hugh M. Emory, Wayne, for James P. Argires, M.D., appellee.

Before ROWLEY, President Judge, and WIEAND, McEWEN, DEL SOLE, MONTEMURO, BECK, TAMILIA, KELLY, and JOHNSON, JJ.

McEWEN, Judge:

Lawrence Brown was brought to the emergency room of Brandywine Hospital at 5:20 p.m. on October 30, 1984, suffering from a gunshot wound of the left supra orbital region and, within the hour, was determined by a neurosurgeon, James P. Argires, M.D., to be suffering from a terminal head injury. As a result of his diagnosis, Dr. Argires advised the Delaware Valley Transplant Program (DVTP) that Mr. Brown, who was placed on life support systems, was a potential donor of organs for transplantation and, at approximately 7:15 p.m. that evening a tissue typing biopsy was performed. Cerebral death was documented at 10:35 p.m. on October 30, 1984, and the kidneys and heart of the decedent were removed for transplantation during the early morning hours of November 1, 1984. The first relative of the decedent to be located as a result of the search undertaken by state police was the decedent's sister, Virginia Brown, who was located at her office at 10:15 on the morning of November 1, 1984.

This action was subsequently commenced by appellants: Virginia Brown, the sister of the decedent, in her capacity as an individual as well as administratrix of the estate of Lawrence Brown; Thomas Brown, the father of the decedent; and Joan Spina and Johnnie Lee Brown, the sister and brother of the decedent. Appellants named as defendants in the action the Delaware Valley Transplant Program (hereinafter DVTP); Arthur Harrell, coordinator for DVTP; Brandywine Hospital;

the president of Brandywine Hospital, Norman Ledwin; the administrator of the Brandywine Hospital, Phillippe Oullette; James Argires, the aforementioned neurosurgeon; the executive director of DVTP, Howard Nathan; the attorney for the Hospital, Samuel Heed; and Charles Wagner, M.D.[1], the surgeon who removed the organs for transplantation.

Appellants sought money damages from appellees based upon appellees' participation in the harvesting of Lawrence Brown's heart and kidneys. The complaint filed by appellants sets forth causes of action for:

(1) mutilation of a corpse,

(2) intentional infliction of emotional distress,

(3) civil conspiracy, and

(4) assault and battery.[2]

Following the close of the pleadings, all appellees moved for summary judgment on the basis of the qualified immunity afforded by Section 8607(c) of the Anatomical Gift Act, 20 Pa.C.S. § 8607(c). The trial court granted the motion for summary judgment on the basis of the qualified immunity, and this timely appeal was taken from the judgment entered in favor of all appellees.

Appellants contend that there exist material issues of fact as to whether appellees acted in good faith or whether appellees sought to avoid the provisions of the Act so as to obtain the decedent's organs without the consent of any of the individuals authorized by Section 8602(b) of the Act to give such consent. Essentially the allegations of appellants' complaint are based upon appellants' belief that appellees purposefully circumvented the provisions of the Pennsylvania Anatomical Gift Act,

---

1. Attorney Samuel Heed and Charles Wagner, M.D., are no longer parties to the action. This Court affirmed the dismissal of all counts against Attorney Heed in *Brown v. Delaware Valley Transplant Program*, 372 Pa.Super. 629, 539 A.2d 1372 (1988), and counsel for appellants stated during the presentation of oral argument that Dr. Wagner had been dismissed as a result of appellants' determination that he had acted in "good faith".

2. The complaint also contained counts alleging malicious use of process and negligent infliction of emotional distress. These counts, however, were dismissed in response to preliminary objections and are not at issue in the instant appeal.

thus precluding application of the good faith defense provided by Section 8607(c) of the Act. We find that there is no dispute as to any *material* fact, that the undisputed evidence of record establishes the good faith of appellees, and that appellees are, as a matter of law, entitled to the qualified immunity provided by the Act. We, therefore, affirm the judgment entered in favor of appellees.

■ The Uniform Anatomical Gift Act has been adopted, with minor variations, in all fifty states and the District of Columbia. Section 8602(b) of the Pennsylvania Act, which is identical to the Uniform Act, establishes a descending order of priority for those persons with authority to make an anatomical gift:

b) Any of the following persons, in order of priority stated, *when persons in prior classes are not available at the time of death,* and in the absence of actual notice of contrary indications by the decedent or actual notice of opposition by a member of the same or a prior class, may give all or any part of the decedent's body for any purpose specified in Section 8603 of this code:

(1) the spouse;

(2) an adult son or daughter;

(3) either parent;

(4) an adult brother or sister;

(5) a guardian of the person of the decedent at the time of his death; and

(6) *any other person authorized or under obligation to dispose of the body.*

\* \* \* \* \* \*

c) The persons authorized by subsection (b) of this section may make the gift after or immediately before death.

20 Pa.C.S. § 8602.

Section 8607(c) of the Act provides that any

person who acts in good faith in accord with the terms of this chapter or with the anatomical gift laws of another state or a foreign country is not liable for damages in any civil

action or subject to prosecution in any criminal proceeding for his act.

20 Pa.C.S. § 8607(c).

The argument of appellants that appellees were guilty of a purposeful failure to act as well as purposeful non-disclosure is based upon the following facts as recited in appellants' brief:

"Between 6:00 p.m. and midnight on October 30, 1984, the Pennsylvania state police had obtained a voter registration card, an unemployment card, an address, a post office box, a Social Security number, and a witness' statement that the person he had seen shot was named 'Larry' and determined that such information was a sufficiently accurate and positive identification to formulate the basis for a sworn affidavit that the victim of the shooting was Larry Brown. At this same point in the chronology of events, the Delaware Valley Transplant Program had also obtained information indicating that the shooting victim had been identified as Lawrence Brown by an 'apparent girlfriend'. It is further undisputed that by 9:15 a.m. the following morning the individual in the hospital had been positively identified by the shooter as Larry Brown, a resident of Frank's Folly Campground. Notwithstanding the foregoing, the [appellees] maintain even today, more than five years later, that *no one* in the hospital or the Transplant Program knew the identity of Larry Brown at this same point in time. Finally, it is absolutely clear, both from deposition testimony as well as the defendants' summary judgment motion, that at no time on October 30, 1984, did anyone from Brandywine Hospital or the Transplant Program make any attempt of any kind to locate the next of kin of Larry Brown."

Essentially, counsel for appellants argues that three facts preclude the entry of summary judgment in favor of appellees:

(1) that the state police rather than any of the appellees were the only individuals actively searching for Larry Brown's next of kin;

(2) that the appellees, aware of the decedent's tentative identification as Larry Brown, caused all references to

the decedent in the petition as originally filed to be to "John Doe" instead of "Larry Brown"; and

(3) that counsel for appellees represented to the trial court that there was no authority directly on point which would authorize the trial court to enter an order granting permission to the DVTP to harvest decedent's heart and kidneys.

We conclude, for reasons hereinafter set forth, that these facts, accepted as true for purposes of ruling upon the entry of summary judgment, do not provide any basis upon which to disturb the ruling of the distinguished Judge Charles B. Smith that appellees were entitled to the good faith immunity provided by the Act.

Appellants contend that the appellees' reliance upon the efforts of the state police to locate the decedent's next of kin is evidence of their lack of good faith and their indifference to the requirement that consent be obtained, if possible, from a close relative pursuant to the classifications established by Section 8602(b). We disagree. The qualified immunity provided by Section 8607(c) of the Act requires a "good faith" attempt to comply with all of the statutory requirements for organ donation. The statute does *not* require any particular type of search for members of higher classes in order to establish the unavailability of members of that class. Section 8607(c) of the Pennsylvania statute was adopted verbatim from Section 7(c) of the Uniform Anatomical Gift Act, and was designed to simplify, facilitate, and encourage organ donation. As noted in the Comment to Section 7 of the Uniform Act:

the entire Section 7 merits genuinely liberal interpretation to effectuate the purpose and intent of the Uniform Act, that is to encourage and facilitate the important and ever increasing need for human tissue and organs for medical research, education and therapy, including transplantation.

*8A Uniform Laws Annotated, § 7.*

The difficulty encountered by the State Police in their attempt to expeditiously locate Larry Brown's relatives was occasioned not by any failure on the part of appellees but rather by reason of the estrangement between Larry Brown

and his family. The state police came into possession of decedent's voter registration card and a Social Security card, but neither document contained a photograph or identified members of his family. The state police quickly located Pamela Batson, the decedent's paramour with whom he had resided for the nine months immediately preceding his death, but Ms. Batson indicated that she believed the decedent's parents were dead and that the decedent's two sisters and one brother, whose names she did not know, did not reside in Pennsylvania. Moreover, the personal effects of the decedent, which were located at the home he shared with Ms. Batson, did not include any documents or correspondence containing the names or addresses of any family member.

The deposition testimony of the troopers involved in the search for Larry Brown's relatives firmly established a good faith effort on their part which culminated in the notification of Virginia Brown, less than forty-eight hours after the decedent was brought to the emergency room, at 10:15 a.m. on the morning of November 1, 1984. The testimony of appellants themselves established that the difficulty encountered by the state police was the result of family estrangement and not lack of diligent police effort:

> Appellant Virginia Brown, the sister of the decedent and administratrix of his estate, testified that she had not spoken with her brother in four or five years and did not know where he was living at the time of his death.
>
> Appellant Thomas Brown, the father of the decedent testified that he had not seen his son for at least one year and did not know where he was living at the time of his death.
>
> Appellant Joan Brown Spina, another sister of decedent, testified that she had not spoken with the decedent for approximately three years prior to his death and appellee Johnnie Lee Brown testified that he had last seen his brother approximately four years before his death.

Thus, the record establishes that at the time of the decedent's death on the evening of October 30, 1984, none of the individuals authorized by Section 8602(b)(1) through (b)(5) to make a decision concerning organ donation were available, and dem-

onstrates as well that the State Police, acting at the request of the appellees, conducted a diligent, good faith effort to locate the members of the decedent's family. Nor was there any suggestion, from any source, that the decedent or any of the individuals enumerated in sub-sections (b)(1) through (b)(5) were opposed to organ donation.[3] The Act authorizes, in the absence of the individuals specified by Section 8602(b)(1) through (b)(5), "any other person authorized or under obligation to dispose of the body," to make the decision regarding organ donation. As a result, appellees, pursuant to Section (b)(6) of the Act, proceeded to obtain a court order authorizing the hospital to make the decision regarding organ donation. Appellees unquestionably proceeded in accordance with the intent of the Pennsylvania Uniform Anatomical Gift Act, since the priority scheme established by section 8602(b) was drafted "taking into account the very limited time available following death for the successful removal of such critical tissues as the kidney, the liver and the heart". *8A Uniform Laws Annotated* at p. 35 (1983).

As a result, we conclude that the undisputed facts of record establish, as a matter of law, the good faith of appellees in attempting to locate those individuals specified in subsections (b)(1) through (b)(6) of Section 8602 of the Act. As we pronounce that the good faith of appellees has been established as a matter of law, we echo the reasoning of the Supreme Court of Wayne County, New York, which, while recognizing that the issue of whether an individual has acted in "good faith" is generally a question of fact rendering summary judgment inappropriate, held that

after an extensive review of the reasoning behind these so-called "good faith decisions", this Court believes that the instant case is distinguishable. In those decisions, the court had to deal with the question of whether a defendant had

**3.** Each of the appellants has candidly testified that they are not morally or ethically opposed to organ donation and do not know what their response would have been to a timely request for organ donation which all hospitals are required to make "on or before the occurrence of death in an acute care general hospital" pursuant to Section 8608(a) of the Act, 20 Pa.C.S. § 8608(a).

"conformed to a standard of conduct required by law", and that determination was held to be a question of fact. (*Kiernan v. Hendrick*, 116 A.D.2d 779, 781, 497 N.Y.S.2d 171, *appeal dismissed*, 68 N.Y.2d 661, 505 N.Y.S.2d 76, 496 N.E.2d 235). In those cases, most of which involved dealings of a corporate or commercial nature, there was no express or specific criteria of a statutory nature incorporating such a "standard of conduct" against which an individual's conduct could be measured, without submitting evidence in the form of in-court testimony to a trier of fact.

In the instant case, however, the Court believes that the Legislature has created an objective standard by which the good faith of a donee could be measured. The Uniform Anatomical Gift Act establishes a statutory scheme which outlines the means of effecting an anatomical gift, the classes of individuals entitled to effect such a gift, and the circumstances under which such a gift must be deemed null and void. None of the previous good-faith cases have involved such a definitive standard by which to judge a defendant's conduct.

*Nicoletta v. Rochester Eye and Human Parts Bank, Inc.*, 136 Misc.2d 1065, 1068–69, 519 N.Y.S.2d 928, 931 (1987).

Appellants also contend that two specific facts related to the court proceedings create a genuine issue of material fact precluding summary judgment:

First, that the emergency petition submitted to the Court of Common Pleas of Chester County identified the decedent as "John Doe" when the hospital and the state police were by then reasonably certain that the decedent's name was Larry Brown; and

Second, that counsel for the Hospital, Attorney Heed, in response to an inquiry from the Court as to the existence of a specific statute authorizing the court to direct the harvesting of the decedent's organs for transplantation, responded that he was not aware of "specific authority that will allow you to do that, but I would certainly think you would have the general power to do that".

There is no merit to either contention, for neither the designation of the decedent as "John Doe" on the petition, nor the statement that counsel was unaware of *specific* authority for the entry of the requested order creates an issue of fact as to whether appellees made a good faith attempt to comply with the provisions of the Pennsylvania Uniform Anatomical Gift Act.

Counsel for the Hospital stated to the court that he had caused the petition to be drafted identifying the decedent as "John Doe, Caucasian male, age 28" as a result of *counsel's* lack of knowledge that the decedent had, by that time, been tentatively identified as Lawrence Brown. Appellee Norman Ledwin, who was present for the hearing, advised the court that the police had identified the decedent as Larry Brown, that his girlfriend had been located, that no relatives had been found yet, and that the hospital sought to secure the permission of the court since the decedent's girlfriend was not an individual who could make a decision regarding organ donation.[4]

4. MR. HEED: So I don't think you need to do that. What you need to do is allow them to extract the organs so that the donees may have the benefit thereof. *I cannot cite you specific authority that will allow you to do that, but I would certainly think you would have general powers to do that.*

*The problem here is, of course, that next of kin have not been reached. But all due efforts have been made to ascertain—*
THE COURT: What efforts have been made? Perhaps you ought to state them for the record.
MR. HEED: Perhaps I should have Mr. Ledwin state them.
MR. LEDWIN: Since the case is being conducted the investigation—by the state police and they have been dispatched to try to ascertain next of kin, we have searched all our medical records for a match with the victim, but unable to find any match in the medical records. The state police and the district attorney's office has not been able to find any next of kin at this point in time. They did find a girlfriend who obviously does not have the right to make that judgment. She does not know of any next of kin.
THE COURT: So you know who the person is? It is not a John Doe at this point.
MR. LEDWIN: Yes. We have identified him as a Lawrence Brown.
THE COURT: From around here?
MR. LEDWIN: We don't know. Last night he was found in West Brandywine Township with a small caliber gunshot wound to the upper

The court, as a result of the exchange with Attorney Heed and Appellee Ledwin, amended the petition and order to reflect the decedent's name as Lawrence Brown. Appellants have not produced any evidence from any source that appellees had purposely sought to conceal the decedent's name from the court. Nor can such an inference be drawn under the circumstances of this case since no positive identification of the decedent had yet been made, no photographic identification had been recovered, and no medical or dental records of the decedent had been obtained. Thus, while the state police

left eye. They feel that he was transported and dropped there and that the incident occurred at some other location.

MR. HEED: I apologize, Judge. I was under the impression, and as a matter of fact the petition was drawn such that we did not know who the victim is.

MR. LEDWIN: At this point the state police have picked up a suspect and they have identified him with that particular name. There was no identification or evidence of identification on his personal belongings last night when he was brought in to the institution.

THE COURT: All right. Well, frankly, gentlemen, I would be willing to permit the organs to be removed once he is pronounced dead. I would prefer to do it that way. Is it going to cause you any problems, Mr. Ledwin?

MR. LEDWIN: Technically when organs are retrieved the individual is maintained on life support equipment and once that equipment is—the organs are removed surgically and at the time of removal the patient is then pronounced dead at the OR. In other words, if we take the respirator off—that is the only support now. There is no medication that is being used. If we were to remove that then the functions would terminate. It is done simultaneously. The harvesting team would be brought out from the medical school.

THE COURT: It is a situation, however, where if you didn't have the permission to remove the organs you would simply feel to be within your authority to terminate the life support systems and pronounce the man dead?

MR. LEDWIN: Yes. He has met all the criteria established by the coroner's office and the criteria for brain death.

THE COURT: All right.

MR. HEED: If I may, Your Honor, we have the petition and order in the matter of John Doe. I should change that, I would believe, to Lawrence Brown. I am going to. I hope the Judge will forgive my scribbling.

THE COURT: Well, you are going to have to forgive mine because I am going to change in the order too.

All right. You will see that that is filed?

MR. HEED: Yes. Today, Your Honor.

Thank you, Your Honor. Appreciate it.

THE COURT: Thank you.

and hospital personnel believed that the decedent was Lawrence Brown, their identification remained tentative.

Nor may a court draw the inference desired by appellants from counsel's statement to the court that he was unaware of "specific authority" authorizing the court to order the harvesting and transplantation of the decedent's organs due to the exigency of the situation and the inability of the state police to locate any relatives. We simply find unacceptable the argument of appellants, that counsel's failure to cite, in response to the court's inquiry, the Pennsylvania Uniform Anatomical Gift Act, 42 Pa.C.S. § 8602, is evidence of bad faith.

The Act, in fact, does *not* specifically authorize a court to enter an order granting the hospital the right to donate an individual's organs where none of the relatives designated in Section 8602(b) can be located at the time of death. Moreover, our research does not disclose that any appellate forum, in any of the jurisdictions which have adopted the Uniform Act, has addressed the use of a court order in lieu of consent by any of the individuals designated in the Act. While counsel could certainly have persuasively argued that a court order authorizing the hospital to harvest the decedent's organs was impliedly authorized by Section 8602(b)(6), counsel's failure to so assert cannot, under any stretch of the imagination, be considered evidence of bad faith. As the learned trial court observed, appellees "complied with the requirements of the Act, and in fact, went beyond that which was required of them by seeking a court order granting its consent".

We agree and even observe that it was not the actions of appellees which inspired, during our study of this appeal, a sense of a diminished presence of good faith. In any event, we conclude that the trial court properly granted the motions of appellees for summary judgment.

Order affirmed.

JOHNSON, J., files dissenting opinion.

JOHNSON, Judge, dissenting:

The Majority affirms the grant of the Motion for Summary Judgment, in favor of Brandywine Hospital and all other

appellees, based on the trial court's determination that the hospital was an authorized organ donor under 20 Pa.C.S. § 8602(b)(6), and, that all appellees acted in "good faith" and were thus immune from civil liability under 20 Pa.C.S. § 8607(c). From my review of the record, I conclude that the hospital has not established its authority to donate the organs of the decedent. Further, the question of the good faith of the hospital and other appellees is an issue of material fact, which must be submitted to a finder-of fact, rendering the order granting summary judgment improper. I must, therefore, dissent.

In reviewing an order granting a motion for summary judgment, we must view the record in the light most favorable to the non-moving party. *Dorohovich v. West American Insurance Co.*, 403 Pa.Super. 412, 589 A.2d 252 (1991). All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. *Marks v. Tasman*, 527 Pa. 132, 589 A.2d 205 (1991). Moreover, in summary judgment proceedings, it is not the court's function to determine the facts, but only to determine if a material issue of fact exists. *Godlewski v. Pars Manufacturing Co.*, 408 Pa.Super. 425, 597 A.2d 106 (1991). Summary judgment is proper only where the pleadings, depositions, answers to interrogatories, admissions of record and affidavits on file support the trial court's conclusion that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Pa.R.C.P. 1035(b); *Penn Center House v. Hoffman*, 520 Pa. 171, 553 A.2d 900 (1989). Under this standard, a reviewing court should overturn the trial court's grant of a motion for summary judgment where there is an error of law or manifest abuse of discretion. *Peffer v. Penn 21 Associates*, 406 Pa.Super. 460, 594 A.2d 711 (1991).

In the present case, the Majority relies upon Pennsylvania's enactment of the Uniform Anatomical Gift Act (Act) to uphold the trial court's grant of immunity from civil liability to the appellees. In order to qualify as a "person who may execute an anatomical gift," the hospital must be one of a class of

persons authorized under 20 Pa.C.S. § 8602. This statute, in pertinent part, states:

> (b) Any of the following persons, in order of priority stated, when persons in prior classes are not available at the time of death, and in the absence of actual notice of contrary indications by the decedent or actual notice of opposition by a member of the same or a prior class, may give all or any part of the decedent's body for any purpose specified in section 8603 of this code:
>
> (1) the spouse;
>
> (2) an adult son or daughter;
>
> (3) either parent;
>
> (4) an adult brother or sister;
>
> (5) a guardian of the person of the decedent at the time of his death; and
>
> (6) any other person authorized or under obligation to dispose of the body

Under the Act, those acting in compliance with the Act may be immunized from criminal and civil liability under 20 Pa.C.S. § 8607(c). This section states:

> (c) A person who acts in good faith in accord with terms of this chapter or with the anatomical gift laws of another state or a foreign country is not liable for damages in any civil action or subject to prosecution in any criminal proceeding for his act.

The Majority concludes that the hospital was qualified, under the Act, to donate Larry Brown's organs for transplant purposes under 20 Pa.C.S. § 8602(b)(6). The Majority also finds that the appellees are immune from civil liability, under 20 Pa.C.S. § 8607(c), because they acted in good faith. I reject both of these conclusions.

First, appellees have not proven, as a matter of law, that the hospital qualified as a person who may execute an anatomical gift, under 20 Pa.C.S. § 8602(b)(6). The Majority accepts the trial court's determination that the hospital was an authorized donor under § 8602(b)(6), stating that there was compliance "with the intent" of the Act. The trial court determined that

the appellees were authorized donors through reference to the definitions contained in 20 Pa.C.S. § 8601. This section states in pertinent part:

"**Person.**" Means an individual, corporation, government or governmental subdivision or agency, business trust, estate, trust, partnership or association, or any other legal entity.

While the trial court correctly concluded that the hospital, in the present case, is included in the definition of "person" under the Act, it does not automatically follow that the hospital was "authorized or under obligation to dispose of the body" of Larry Brown. Neither the appellees nor the Majority cite to authority which permits the hospital to qualify, as a matter of law, as a donor under 20 Pa.C.S. § 8602(b)(6).

At oral argument, council for the hospital directed us to 35 Pa.S. § 1092 to support the allegation that the hospital was authorized to dispose of the body of the decedent, as required for donors under 20 Pa.S. § 8602(b)(6). This statute provides only that various entities and organizations, including hospitals, are required to report any bodies which must be buried at public expense, to the Anatomical Board of the State of Pennsylvania. 35 Pa.S. § 1092. Nowhere does the statute state that hospitals are authorized or under an obligation to dispose of dead bodies. Moreover, under a related statute, 35 Pa.S. § 1114, any body which remains unclaimed thirty-six hours after death, falls under the jurisdiction of the Anatomical Board of the State of Pennsylvania. If the Anatomical Board declines jurisdiction over the body, 35 Pa.S. § 1092 directs that the body will be commended to the county commissioners or county executive officers for burial at county expense. Nowhere in this Act, entitled Disposition of Dead Human Bodies, are hospitals given authority or placed under an obligation to dispose of dead bodies. See 35 Pa.S. §§ 1091–1123.

The Comment to the 1968 version of the Uniform Anatomical Gift Act gives some guidance in determining who is authorized to dispose of the body of a decedent, under § 2(b)(6) of the Uniform Act or § 8602(b)(6) of the Pennsylva-

nia Act. This Comment states in part: "Subsection (b) spells out the right of survivors to make the [anatomical] gift." 8A U.L.A. 35 (1968). While this language may not clearly specify who is "authorized" to dispose of a decedent's body, neither the Majority nor the appellees have attempted to establish that the hospital could be considered a survivor of the decedent.

Various commentators have speculated on the grave public policy implications of state legislatures permitting institutions to qualify as donors under the Uniform Anatomical Gift Act. *See e.g.* Quay, *Utilizing the Bodies of the Dead,* 28 St. Louis U.L.J. 889, 897 (1984). Research reveals no case law in this or any jurisdiction in which a hospital has been recognized as an organ donor in the absence of a donation by the decedent or the decedent's next-of-kin. However, in an attempt to clarify who should hold donor status, the Uniform Act, as amended in 1987, now provides that only the decedent's next-of-kin, legal guardians, or in their absence, the coroner or other public health official may make an anatomical gift on behalf of a decedent. *See* Uniform Anatomical Gift Act §§ 3–4, 8A U.L.A. 17–18 (1987). *See also* Note, *She's Got Bette Davis['s] Eyes: Assessing the Nonconsensual Removal of Cadaver Organs Under the Takings and Due Process Clauses,* 90 Columbia L.R. 528, 537 (1990). This amendment has yet to be adopted by the legislature in this Commonwealth.

In the absence of both statutory and common-law precedent, I am unable to conclude that the hospital has established that it was an authorized donor, as described in Pennsylvania's Act. 20 Pa.C.S. § 8602(b)(6).

However, even if I were to conclude that the hospital was authorized to dispose of the body of the decedent, the disposition of this case through the grant of a motion for summary judgment would remain improper, as the question of whether the appellees have acted in good faith, so as to be immune from liability under 20 Pa.C.S. § 8607(c), is one of material fact which must be submitted to the jury.

A review of the record reveals the following facts. On October 30, 1984, the decedent was admitted to the hospital

with a gunshot wound to the head. The decedent was identified shortly after admission as Larry Brown, with all hospital records bearing the decedent's name and address. R.R. at 29a–36a. Despite this identification, the hospital referred to the decedent as John Doe, an unidentified person, in its Petition for Consent to Perform Emergency Organ Extraction. The hospital's petition to the court for removal of the decedent's organs indicates that: "[t]he hospital has made every available effort first to determine the identity of the patient and then to locate next of kin, but all efforts have been to no avail." R.R. at 16a. Yet, no evidence has been produced by the hospital to indicate that it made any effort to contact the decedent's next-of-kin, prior to seeking a court order to donate the decedent's organs.

My review of the record indicates that the hospital represented to the court, when seeking permission to remove the decedent's organs that:

... What you need to do is allow them to extract the organs so that the donees may have the benefit thereof. I cannot cite you specific authority that will allow you to do that, but I would certainly think you have the general powers to do that.

N.T., October 31, 1984, at 4. The court, based on the representations of the hospital, granted the order permitting the removal of the decedent's organs. Order of Court, October 31, 1984. The harvesting of the decedent's organs was subsequently performed. Now, the hospital and other appellees seek to rely on the Act and the immunity provided under 20 Pa.C.S. § 8607(c).

The Majority asserts that Larry Brown's family members were "unavailable". However, within 48 hours of the decedent's admission, Virginia Brown, his sister, was present in the hospital. Moreover, when Virginia arrived at the hospital, the hospital vice president, despite the fact that the organs had been removed without permission several hours earlier, attempted to have her sign a consent to donate her brother's organs. Deposition of Phillippe Oullette, May 22, 1989, at 126. These facts belie a finding of good faith, as a matter of law.

The Majority recognizes that whether a person or an entity has acted in good faith is generally a question of fact for the jury. Thus, in a motion for summary judgment, it is only when the facts are so clear that reasonable minds cannot differ, that a decision may be made, as a matter of law. *See Hayward v. Medical Center of Beaver County*, 530 Pa. 320, 608 A.2d 1040 (1992). I conclude that reasonable minds could, and do, differ as to whether the appellees acted in good faith. Therefore, this question must be submitted to the finder-of-fact.

The question of whether a person has acted in good faith has been held to be an issue of material fact and an improper one for disposition through summary judgment. *See e.g. Banker v. Valley Forge Insurance Co.*, 401 Pa.Super. 367, 585 A.2d 504 (1991), *alloc. denied*, 529 Pa. 615, 600 A.2d 532 (1991). In *Banker*, we reversed the grant of a motion for summary judgment, stating that the determination of whether an insurance company had breached its duty of good faith and fair dealing was an issue of material fact. *Id.* 401 Pa.Super. at 378–379, 585 A.2d at 510–511.

The issue of whether a person has acted in good faith so as to qualify for immunity under § 8607 of the Act is one of first impression in this Commonwealth. In this jurisdiction, there has yet to be a determination as to whether the question of good faith, under the Act, should be deemed to be a matter of fact or a matter of law. There is also an ostensible split of authority existing among other jurisdictions that have considered this issue. The Wisconsin Supreme Court has addressed the issue of good faith, under the Uniform Act, in *Williams v. Hoffman*, 66 Wis.2d 145, 223 N.W.2d 844 (1974). In that case, the court described good faith as a term which prescribes a general code of conduct, stating: "[w]hether an individual acted in good faith is a question that can only be answered following a careful analysis of the facts in a particular case." *Id.* at 153, 223 N.W.2d at 848. I would adopt this analysis of the requirement of good faith under the Act, since it follows the traditional view held by the courts in this Commonwealth, that questions of good faith are for the jury.

The Majority relies on *Nicoletta v. Rochester Eye and Human Parts Bank, Inc.,* 136 Misc.2d 1065, 519 N.Y.S.2d 928 (1987), a New York Supreme Court case, to support its contention that good faith, under the Uniform Act, can be decided as a matter of law. There, after the death of Peter Nicoletta, his "wife" donated his eyes for transplant purposes. However, after the anatomical gift had been made, the woman who purported to be Nicoletta's wife was discovered to be not his legal wife, but a woman with whom the decedent had cohabited for ten years. The father of the decedent sued the hospital to recover for the emotional/psychological injuries he suffered due to the unauthorized removal of his son's eyes. The court recognized the general rule articulated in *Williams v. Hoffman,* which defines questions of good faith as issues of fact. *Id.* at 1068–69, 519 N.Y.S.2d at 931. Nonetheless, the *Nicoletta* court affirmed the order granting summary judgment in favor of the hospital on the ground that it was undisputed that the hospital followed the letter of the Anatomical Gift Act, authorizing a spouse as the first alternative donor absent a donation by the decedent. The court, there, held that under those particular facts, and, in the absence of notice as to the true identity of the woman, it would frustrate the purpose of the Uniform Act and would place unreasonable demands upon the hospital to require further investigation, by the hospital, into the identity of the purported spouse.

The *Nicoletta* legal analysis, adopted by the Majority, cannot be applied in the present case, as the facts in *Nicoletta* are vastly different from those before us. Here, the hospital and its staff identified the decedent as a potential donor prior to attempting contact with any family member. The hospital, and other appellees, did not rely on the consent of an authorized donor under the Anatomical Gift Act. Rather, the hospital, failing to search for or contact the decedent's next-of-kin, sought to place itself in the role of an authorized donor. This is not a case, such as *Nicoletta,* where a clear attempt to follow the Act had been made. Moreover, I am unable to conclude that an undue burden would be placed on the hospital if it were required to attempt notification of family members

prior to assuming the role of alternate donor of the decedent's organs. The "good faith" of the appellees, in the present case, is not so clear and undisputed that a court could pass on it as a matter of law. Here, the dispositive question, whether the appellees conducted themselves in good faith, is a highly contested and complex issue of material fact, which we are required to submit to the finder-of-fact. *See Banker, supra; Commonwealth ex rel. Broscious v. Fern,* 418 Pa.Super. 34, 613 A.2d 17 (1992).

Accordingly, I dissent.